# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **DANIEL GEEO, on his own behalf and on behalf of those similarly situated,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Case No. 3:22-cv-00359** |
| | ) | **Judge Aleta A. Trauger** |
| **BONDED FILTER CO., LLC, d/b/a BFC Solutions,** | ) ) | |
| **Defendant.** | ) ) ) | |

## MEMORANDUM

Before the court is plaintiff Daniel Geeo's Motion to Facilitate Court-Authorized Notice to Other Similarly Situated Potential Plaintiffs ("Motion for Notice") under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), filed along with a supporting Memorandum of Law. (Doc. Nos. 60, 61.) Defendant Bonded Filter Co., LLC ("BFC") has filed a Response in Opposition to the Motion for Notice (Doc. No. 63), and the plaintiff has filed a Reply (Doc. No 71). As set forth herein, the court finds that the plaintiff has failed to make a threshold showing that there is a "strong likelihood" that there are other employees of BFC who suffered an FLSA violation and are similarly situated to the plaintiff. *Clark v. A&L Homecare & Training Ctr., LLC*, 68 F.4th 1003, 1011 (6th Cir. 2023). The motion, therefore, will be denied, and the plaintiff's also pending Motion to Toll Statute of Limitations for future opt-in plaintiffs (Doc. No. 26) will be denied as moot.

## I. LEGAL STANDARD

The FLSA requires employers to "pay overtime to most employees who work more than 40 hours a week." *Pierce v. Wyndham Vacation Resorts, Inc.*, 922 F.3d 741, 745 (6th Cir. 2019)

(citing 29 U.S.C. § 207(a)(1)). The statute permits employees alleging a violation of this provision to bring suit on their own behalf and that of "other employees similarly situated." 29 U.S.C. § 216(b). However, "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." *Id.* In other words, this provision establishes two requirements for a collective action under the FLSA: (1) the additional plaintiffs must "actually be 'similarly situated'"; and (2) they must "signal in writing their affirmative consent to participate in the action." *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006). The statute does not define "similarly situated" or prescribe the process for adding other plaintiffs to a collective action.

In *Hoffman-LaRoche Inc. v. Sperling*, 493 U.S. 165 (1989), the Supreme Court held that "district courts have discretion, in appropriate cases, to implement" Section 216(b), "by facilitating notice to potential" members of a Section 216(b) collective action. *Id.* at 169–70. In the absence of additional guidance as to how such a procedure would work, most district courts, following *Hoffman-LaRoche*, "adopted a two-step approach first described in" *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 361 (D.N.J. 1987). *Clark*, 68 F.4th at 1008. Under *Lusardi*'s "fairly lenient" "first step—called 'conditional certification'—a district court [could] facilitate notice of an FLSA suit to other employees" based on a "'modest factual showing' that they [were] 'similarly situated' to the original plaintiffs." *Id.* (citation omitted). At the second step, conducted after discovery, the district court would decide whether the "other employees" were actually "similarly situated to the original plaintiffs." *Id.* If so, the court would grant "final certification" for the case to proceed to decision as a collective action. *Id.* (citation omitted). The Sixth Circuit had acknowledged this procedure but, until recently, had never formally either approved or disapproved it.

In *Clark*, issued in May of this year, the Sixth Circuit firmly rejected both *Lusardi*'s "conditional certification" procedure as well as its "modest showing" standard, while continuing to recognize the need for a two-stage process—a first stage at which the court determines whether to authorize notice to potential plaintiffs, and a second stage at which the court determines whether the notified employees who have given notice of desire to opt in as plaintiffs are actually similarly situated to the named plaintiff and each other. *See id.* 1010–11. Only those employees who, after discovery, are determined to actually be similarly situated will then become plaintiffs in the underlying action. *Id.*

Regarding the factual showing required at the first stage of this process, the court, borrowing from the preliminary injunction standard, held that, "for a district court to facilitate notice of an FLSA suit to other employees, the plaintiffs must show a 'strong likelihood' that those employees are similarly situated to the plaintiffs themselves." *Id.* at 1011. The court explained that this level of proof

> requires a showing greater than the one necessary to create a genuine issue of fact, but less than the one necessary to show a preponderance. The strong-likelihood standard is familiar to the district courts; it would confine the issuance of court-approved notice, to the extent practicable, to employees who are in fact similarly situated; and it would strike the same balance that courts have long struck in analogous circumstances.

*Id.* The court also stated that, in applying this standard, "district courts should expedite their decision to the extent practicable," particularly in light of the generally applicable two-year statute of limitations contained in the FLSA *Id.* The court noted that, to facilitate resolution of a motion for court-facilitated notice, a district court "may promptly initiate discovery relevant to the motion, including if necessary by 'court order.'" *Id.* (quoting Fed. R. Civ. P. 26(b)(1)).

The *Clark* majority opinion did not "address the underlying threshold for FLSA similarity, which remains the same." *Id.* at 1020. Historically, courts in the Sixth Circuit have looked to three

"non-exhaustive" factors to determine whether members of the collective action are similarly situated:

> (1) the "factual and employment settings of the individual[] plaintiffs"; (2) "the different defenses to which the plaintiffs may be subject on an individual basis"; and (3) "the degree of fairness and procedural impact of certifying the action as a collective action."

*Monroe v. FTS USA, LLC*, 860 F.3d 389, 397 (6th Cir. 2017) (quoting *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 584 (6th Cir. 2009); *see also Pierce v. Wyndham Vacation Resorts, Inc.*, 922 F.3d 741, 745 (6th Cir. 2019). Plaintiffs are similarly situated if they can demonstrate that they suffered from "a single, FLSA-violating policy" instituted by the employer defendant, or if their FLSA claims are "unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct." *Monroe*, 860 F.3d at 398 (quoting *O'Brien*, 575 F.3d at 584–85). "'Where Defendants have demonstrated a formal policy to comply with the law and compensate employees for all time worked, Plaintiffs may satisfy their burden by producing substantial evidence of a *de facto* policy of circumventing the law.'" *Fenley v. Wood Group Mustang, Inc.*, 325 F.R.D. 232, 242 (S.D. Ohio 2018) (quoting *Cornell v. World Wide Bus. Servs. Corp.*, No. 2:14-CV-27, 2015 WL 6662919, at *3 (S.D. Ohio Nov. 2, 2015); *see also Kutzback v. LMS Intellibound, LLC*, 301 F.Supp.3d 807, 817 (W.D. Tenn. 2018).

## II.    FACTS AND PROCEDURAL BACKGROUND

On May 17, 2022, Geeo filed his initial Complaint, putatively as a collective action, alleging that BFC violated the FLSA. (Doc. No. 1.) After BFC filed a Motion to Dismiss the original pleading, the plaintiff filed his first Amended Complaint as a matter of course, under Rule 15(a). BFC responded by filing a second Motion to Dismiss. The court granted the Motion to Dismiss the first Amended Complaint but also granted the plaintiff leave to re-open the case and to file a Second Amended Complaint ("SAC") to plead additional facts in support of his FLSA

claim. The plaintiff thereafter filed the SAC (Doc. No. 32), which is the operative pleading in this case. The court denied in part the defendant's Motion to Reconsider the Order reopening the case and authorized the plaintiff to proceed solely with his claim that mandatory morning meetings followed by uncompensated commutes to employees' first worksite of the day resulted in unpaid overtime in violation of the FLSA, as described in greater detail below.[1] (Doc. No. 39.)

The SAC alleges that BFC is a commercial HVAC maintenance company, based in Nashville, that employs "hundreds of technicians who perform maintenance and other technician duties at commercial establishments throughout the United States." (Doc. No. 32 ¶¶ 17–18.) Geeo was employed by BFC from October 2021 through February 2022 as a technician covered by the FLSA, performing HVAC services in various states. (*Id.* ¶¶ 20–21.) Some technicians, like him, were paid an hourly rate, but others were paid on a piece rate basis. (*Id.* ¶¶ 23–24.) The plaintiff claims that, regardless of how they were paid, he and similarly situated maintenance technicians regularly worked more than 40 hours per week but that BFC failed to fully compensate them at one and one-half times their regular rate of pay for all hours over 40 worked in a given workweek.

More specifically, Geeo alleges that BFC required him (and others similarly situated) to "attend a mandatory meeting" prior to arriving at their first job of the day—covering such topics as the "assignments and route for the day, . . . the number of customer projects outstanding, whether roof access was required for a particular job that day, and employee status on hitting company-set goals for the week"—and that, even though their workday commenced with the mandatory meeting, they were not paid for the time spent driving to their first job site after that meeting. (SAC ¶¶ 28, 36, 37.) Instead, BFC "automatically deducted thirty (30) minutes from Class Members'

---

[1] The court also held that the plaintiff's claim relating to unpaid vehicle inspections was not a viable theory of recovery under the FLSA.

pay for 'commute time.'" (*Id.* ¶ 38.) Geeo asserts that this policy violates the FLSA, both because the commute took place after the mandatory morning meeting and, as such, was part of his and others' "continuous workday," and because they performed compensable work during the home-to-work commute, including making work calls to BFC customers. (*Id.* ¶¶ 39–40.) In granting the plaintiff leave to amend and authorizing the filing of the SAC, the court specifically found that the plaintiff's allegations that he and other similarly situated employees were not compensated for otherwise compensable commute time stated a colorable claim under the FLSA.

The plaintiff asserts that other BFC technicians are similarly situated to him, for purposes of the FLSA, because they performed similar job duties, were subject to the same policies, and likewise were not fully paid for all hours over 40 worked in a given workweek. He seeks to pursue this litigation as a collective action on behalf of others similarly situated, including, should they choose to join,

> All technicians who worked for Defendant within the United States remotely and/or based out of a company office during the last three (3) years and who were not compensated at time-and-one-half of their regular rate of pay for all hours worked in excess of forty (40) hours in one or more workweeks.

(*Id.* ¶ 53.)

In May 2022, with his original Complaint, Geeo filed two Consents to Join Collective Action, one signed by Geeo himself and the other by a second current or former BFC employee, Sidney Severs. (Doc. Nos. 6-1, 6-2.) In June 2023, more than a year later and approximately a week before filing his Motion for Notice, the plaintiff filed a third Consent to Join Collective Action, signed by Michael Brooks. (Doc. No. 59-1.)

In support of his Motion for Notice (which was filed just over a month after the Sixth Circuit issued *Clark*), Geeo filed his own Declaration and that of Michael Brooks, to which each declarant attached a pay stub for one pay period in 2022 (Doc. Nos. 61-1, 61-2); a printout from

BFC's website showing that it is hiring Service Technicians at various locations throughout the country (Doc. No. 61-3); a document apparently also from BFC's website that Geeo characterizes as "Composite of Job Descriptions" (Doc. No. 61-4), which appears to be made up of the posted job descriptions for each of the open Service Technician jobs identified in Doc. No. 61-3; and a Complaint against BFC filed in October 2020 in the Southern District of New York (the "Waterman Complaint").

In his Declaration, Geeo asserts facts basically consistent with those in the SAC, with only slightly more detail. He worked for BFC from October 2021 through February 2022. (Doc. No. 61-1, Geeo Decl. ¶ 4.) He was based in Colorado and performed services in Colorado, Wyoming, and Montana. (*Id.* ¶ 5.) He attended training in Nashville, Tennessee, where he met technicians in training from states all over the country, including Alabama, Virginia, and New York, and was told that BFC employed over 700 Service Technicians at any given time. (*Id.* ¶¶ 6–7.) While employed by BFC, he was paid a regular, non-overtime rate of $21 per hour, but he purports to be aware that some technicians were paid on a piece rate basis. (*Id.* ¶ 8.) Based on "conversations with [his] colleagues" and "reviewing job listings on BFC's website," he believes that BFC technicians "all share the same primary job duty"—installing air filters and cleaning coils on commercial ventilation and HVAC systems. (*Id.* ¶ 9.)

Without identifying the source of his knowledge, the plaintiff also avers that technicians, like himself, are "required to attend a meeting" "[p]rior to arriving at the first job site of the day" to go over such things as the assignments, route, and safety measures required for the day. (*Id.* ¶ 10.) He also states that BFC has a "company-wide policy" of automatically deducting 30 minutes per day from technicians' hours "as a commute (drive) time deduction." (*Id.* ¶ 11.) He states: "Technicians, including me, would typically begin our commute to the first job site after the

mandatory meetings." (*Id.* ¶ 12.) Geeo would "[o]ccasionally" attend the mandatory meetings while driving to his first job site and/or "make work calls to BFC's customers" during his commute, but "BFC still deducted this time from [his] hours worked." (*Id.* ¶¶ 12–13, 15.) Based on "conversations with [his] coworkers," Geeo asserts that "other technicians also attended the required meetings before or during their commute to the first job" and/or made work-related calls during the commute (*Id.* ¶¶ 14–15.) He claims that he and other technicians regularly worked overtime, but, because of the policy of automatically deducting 30 minutes commute time per day, they were not fully compensated for all hours of overtime they worked. (*Id.* ¶ 17.) Geeo's attached pay stub for the February 7–13, 2022 pay period shows, for example, that he was paid his standard hourly rate for 40 hours of work and overtime pay at 1.5 times his regular rate for 2.44 hours and that an additional 2.5 hours of time was tagged as "CommuteDed." (Doc. No. 61-1, at 8.) Geeo explains that this entry shows that he worked 5 shifts that week and that 2.5 hours of his commute time was automatically deducted from his pay. (Geeo Decl. ¶ 18.) Finally, Geeo claims that he has "personal knowledge that other technicians also worked overtime hours without receiving all of their overtime compensation because [of] BFC's commute deduction," based on his having "spoken to other current or former BFC technicians on this issue," some of whom "have chosen to come forward and join this lawsuit." (*Id.* ¶ 19.)

Michael Brooks' Declaration is identical to Geeo's in all material respects, except that he was hired in Mobile, Alabama and performed services in Alabama, Mississippi, and New Orleans from October 2021 through June 2022. (Doc. No. 61-2, Brooks Decl. ¶¶ 3–5.) He, too, claims to know that other employees were subject to the same pay policies—including a 30-minute daily commute deduction—based on "conversations with [his] colleagues." (*Id.* ¶ 13.) He claims to have spoken to "many employees who have complained about this policy" and is "confident that they

would join this lawsuit if it becomes a class action [sic]." (*Id.* ¶ 17.) His pay stub for May 30–June 5, 2022 shows 2.5 "CommuteDed" hours for that pay period. (Doc. No. 61-2, at 8.)

The Composite Job Description filed by Geeo shows that the job description for BFC "Service Technician" is essentially the same at virtually all of its facilities and that Service Technicians are paid an hourly rate. (Doc. No. 61-4.) The Waterman Complaint shows that an individual residing in New York filed an FLSA lawsuit in October 2020 against BFC, on behalf of himself and similarly situated BFC employees who worked in New York State, alleging that he was paid based on a "piece-rate" system, had "up to five hours per week deducted for commuting to and from work," and was not paid fully for all overtime hours worked. (Doc. No. 61-5 ¶¶ 12, 14.) The plaintiff states that this lawsuit was settled individually by the named plaintiff, before he sought leave to pursue relief on behalf of others similarly situated. (Doc. No. 61, at 3 n.1.)

Defendant BFC filed a Response in opposition to the Motion for Notice, accompanied by the Declarations of four current BFC employees: Scott Ashwood, Jarrad Babcock, Austin Cox, and David Johnson. Ashwood, BFC's Vice President of Operations, attests that BFC operates in 48 states, providing preventive maintenance for industrial and commercial HVAC systems. (Doc. No. 64, Ashwood Decl. ¶¶ 2–3.) It employs three types of "technicians": "Filter Service Technicians" (such as Geeo, Brooks, and putative opt-in plaintiff Severs), Seasonal Technicians, and Industrial Site Technicians. (*Id.* ¶ 4.) Filter Service Technicians primarily service roof-mounted HVAC systems for "big box retailers," usually servicing six to ten customers each day. (*Id.* ¶ 5.) Technicians "typically drive from their home to their first job site, and then from job site to job site throughout the day, then from their last job site back to their home [at] the end of their workday." (*Id.* ¶ 9.) A Filter Service Technician's workday may start anywhere from 5:00 a.m. to 9:00 a.m., depending on many factors, including the technician's preference, the customer's

preference, the season, and how early the first HVAC system on the technician's schedule is accessible. (*Id.* ¶¶ 9–13.)

Ashwood states that, during the three years prior to the filing of Geeo's initial Complaint, BFC employed 30 different Regional Service Managers ("RSMs") to oversee technicians around the country, each of whom had flexibility over the management and scheduling of the work of the technicians he or she supervised. While BFC technicians typically attended brief daily meetings, or "huddles," during which the RSMs shared information about the day's work, during the relevant time frame, individual managers

> determined when and how often these meetings occurred, as well as the contents of the meetings. Some managers do not hold huddles each day, instead choosing to have them two to three times each week. Some managers schedule their huddle meetings daily, at the same time each day. Other managers hold huddles at varying times during the mornings that the meetings occur.

(*Id.* ¶ 19.) According to Ashwood, while the meeting times varied, "most technicians listen in on these meetings while already at their first jobsite of the day." (*Id.* ¶ 21.)

Ashwood also explains that BFC requires all technicians to record all of the time they spend driving to their first job side and driving home from their last job site, such that "a technician's recorded hours for each day include the entirety of their morning and evening commutes." (*Id.* ¶ 23.) Approximately five years ago, however, BFC implemented a policy of deducting 30 minutes from each technician's recorded time per day, based on its conclusion that commute time is not compensable. (*Id.* ¶ 24.) But prior to taking that step, BFC "analyzed the average commute duration for its technicians" and determined that technicians generally "spent 45 minutes commuting to the first worksite and 45 minutes commuting back home at the end of the day." (*Id.*) BFC elected to deduct 30 minutes of that total 90 minutes, "[t]o ensure that BFC paid for all time worked." (*Id.* ¶ 25.) At the same time, it has "always been BFC's training and expectation that technicians notify BFC when their commute is less than 30 minutes." (*Id.* ¶ 26.) Ashwood asserts

that this policy was codified in BFC's most recent Employee Handbook, as shown in the version attached to his Declaration (signed electronically by Sidney Severs in July 2021). The relevant Handbook provision states:

> A commute deduction will be taken from each pay period in the amount of 30-minutes a day for a total of 2.5 hours per week multiplied by the hourly rate, to reflect that I am not working when driving from my home base or residence to my first jobsite. The commute deduction will not be taken on days that are not worked or on PTO. *By signing this agreement, I agree that 30 minutes is an accurate measurement of the time I spend commuting each workday and does not exceed the time I spend commuting each day. I agree to inform the Company in the event my commute to and from my home base or residence is less than 30 minutes per day.*

(Doc. No. 64-1, at 4 (emphasis in original).)[2]

According to Ashwood, technicians are also expected to notify BFC if they perform work during or before their morning commute. (Ashwood Decl. ¶ 26.) In addition, while he acknowledges that BFC technicians are supposed to call customers to confirm appointments for the day, the "expectation is that the technicians will make most of these calls upon arriving to their first job site, or before leaving for each job throughout the day." (*Id.* ¶ 17.) While technicians may choose to make calls during their morning commute, "that is not BFC's policy or expectation." (*Id.*) Rather, due to safety concerns, "managers should instruct technicians not to make or participate in telephone calls while driving unless using hands free technology." (*Id.*)

Jarrad Babcock's Declaration states that he has been employed by BFC since March 2022 as a Field Service Technician based in Colorado, covering a territory comprised of parts of Colorado, Wyoming, Montana, and South Dakota. (Doc. No. 65, Babcock Decl. ¶¶ 2–4.) He states that, as a Field Service Technician, he attends morning "huddles," but the frequency and timing of

---

[2] The deduction does not apply to technicians who use their personal vehicle for commuting, in which event the technician has to drive to and from a designated site to retrieve his company-assigned vehicle. (Doc. No. 64-1, at 4.)

them has changed throughout his employment, and the huddles also vary in length from 5 to 45 minutes, with the average being 15 minutes. (*Id.* ¶¶ 7–8.) He explains that technicians "track their time worked in a mobile phone application provided by BFC" (the "app"). (*Id.* ¶ 9.) Through this app, he records all of his work time and activities, including his commute time and huddle time. (*See id.* ("When I attend huddles, I select the 'Conference Call' option to appropriately track my time worked during the huddle. When I am driving to the first job site, I indicate that I am commuting on the App with the code 'in route.' When I am driving home after the last job, I select 'Drive Home' to track and be paid for my commute time on the way home.").) He estimates that, during 2022, he was already at his first worksite or on his way to his first worksite for more than 50 percent of the huddles he attended by phone. (*Id.* ¶¶ 9–10.) He believes that, if a huddle started while he was driving, he was "expected to pull over to listen," though he does not state whether he complied with that expectation. (*Id.* ¶ 10.) His understanding is that, other than the required "cursory vehicle inspection" performed prior to starting the morning commute, technicians are "not expected to do any other unpaid work-related activities before their first job of the day." (*Id.* ¶ 11.) He also states that his average commute time to and from his first and last job sites is 40 to 45 minutes, or 90 minutes daily, that BFC deducts 30 minutes from his daily recorded hours to account for commute time, and that he believes he has been paid for all time owed to him for work at BFC. (*Id.* ¶¶ 12–13.)

Austin Cox, who is currently a Regional Service Manager but worked as a Field Service Technician from March 2022 to July 2023 based in Colorado, states similarly that, while he was a Field Service Technician, he could start work as early as he wanted, as long as the customer's site was open for access, and that the timing, frequency, and length of the morning "huddles" varied widely. (Doc. No. 66, Cox Decl. ¶¶ 2, 5–9.) While he was a Field Service Technician, prior to

2023, he attended two to three "huddles" per week, and approximately half of them took place before he left home. (*Id.* ¶¶ 8, 10.) He never attended a huddle when he was "off the clock." (*Id.* ¶ 10.) He also states that his commutes to and from his last job sites "almost always took more than 30 minutes" and that his total commute time was always more than 30 minutes. (*Id.* ¶¶ 17, 19.) He states that no technicians have ever communicated to him that their commute time is less than the amount of time that is deducted. (*Id.* ¶ 19.)

Finally, David Johnson, an RSM based in Florida who formerly worked as a Field Service Technician, then Lead Technician, then RSM based in Pittsburgh, Pennsylvania, avers that, for his first several years as an RSM, he held daily huddles at 7:00 a.m. and that "most if not all of the technicians on [his] team would call in to the meeting while beginning their first job for the workday." (Doc. No. 67, Johnson Decl. ¶¶ 2, 11–12.) He also states that, while technicians are supposed to call customers to confirm service appointments, they are not expected to do it "off the clock," and only "approximately 30–50% of the technicians who work for [him] actually regularly call to confirm appointments with customers. Many don't do it at all." (*Id.* ¶¶ 16–17.) While he is aware that technicians have a deduction for commute time from their timekeeping, no technician who works for him has ever told him that his commute time is less than the amount of time that is deducted. (*Id.* ¶ 20.)

In his Memorandum in support of his Motion for Notice, Geeo identifies the sole issue before the court as whether he has shown that there is a "strong likelihood" that potential plaintiffs are similarly situated to him. (Doc. No. 61, at 2.) He argues that, under *Clark*, that showing depends on whether the plaintiff and other employees performed the same tasks and were subject to the same timekeeping and compensation policies, but that neither the merits of his claims nor the validity of the defendant's common defenses should be considered at this stage. (*Id.*) He asserts

that he has "presented substantial evidence" (*id.* at 3) demonstrating "*more than*" a strong likelihood that he and all potential plaintiffs are similarly situated (*id.* at 13), "in the form of declaration testimony, pay stubs, job postings, and a prior lawsuit involving similar allegations" against BFC, all of which collectively show that he and all potential plaintiffs were non-exempt hourly or piece-rate paid employees under the FLSA, that they were subject to a company-wide policy of deducting 30 minutes per day of what should have been compensable commute time; and that they did not receive all overtime compensation to which they were due. (Doc. No. 61, at 3.)

BFC's Response in opposition to the Motion for Notice argues that the plaintiff's three Consents to Join and two nearly identical Declarations are not sufficient to establish a "strong likelihood" of the existence of a collective of similarly situated individuals who have suffered a common FLSA violation, such that a "collective action would yield 'efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity.'" *Clark*, 68 F.4th at 1012 (quoting *Hoffman-LaRoche*, 493 U.S. at 170)) (*quoted in* Doc. No. 63, at 2). BFC argues that (1) the plaintiff fails to establish the existence of a company-wide policy that violates the FLSA; (2) the plaintiff's and Brooks' Declarations fail to establish an FLSA violation *even as to them*, because they do not address the length of their evening commutes; (3) even if the plaintiff is correct that any morning commute that takes place after the morning huddle is compensable under the FLSA, BFC's declarations show that there is no uniformity as to the time, duration, or frequency of the morning huddles, so the plaintiff's two Declarations do not establish a "strong likelihood" of the existence of similarly situated employees; and (4) the plaintiff's vague hearsay evidence regarding the existence of other employees to whom he has spoken about "the issue" is not sufficient to establish the existence of similarly situated employees who have suffered an FLSA violation. BFC further argues that the Waterman Complaint is proof

of nothing, since it is three years old and, as the plaintiff here concedes, was settled before that plaintiff sought certification as a collective action. Finally, BFC contends that courts confronted with similar evidence have declined to authorize notice.

The plaintiff filed a Reply (Doc. No. 71), in which he argues that the court can and should consider BFC's evidence and that this evidence establishes the existence of company-wide policies that violate the FLSA.

## III.    DISCUSSION

The Sixth Circuit has held that "ordinary home-to-work and work-to-home commute time does not qualify as 'work' under the FLSA even if the employer has paid for such time, and therefore that time is not subject to overtime requirements." *Sec'y of Lab. v. Timberline S., LLC*, 925 F.3d 838, 854 (6th Cir. 2019) (adopting the "regulations and district court cases" reaching that conclusion as "persuasive and a reasonable interpretation" of the FLSA and Portal-to-Portal Act). Consequently, it is clear that an employer's decision to both require its employees to record all time spent commuting and to deduct .5 hours per day as non-compensable ("ordinary") commute time does not amount to a *per se* violation of the FLSA, for purposes of calculating either straight time or overtime pay.

Rather, such an automatic deduction could potentially violate the FLSA only as to an employee whose actual (non-compensable) commute time was less than the .5 hours deducted. And to violate the overtime provision, the employee would have to have worked more than 40 hours in the week during which his commute time was less than 30 minutes per day on a given day. Even then, "[u]nder the FLSA, if an employer establishes a reasonable process for an employee to report uncompensated work time the employer is not liable for non-payment if the employee fails to follow the established process." *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 876 (6th Cir. 2012) (citations omitted). That is, automatically deducted time that should

have been compensated because the employee worked through that time does not give rise to an FLSA violation if the employee fails to follow established procedure for correcting the automatic deduction. *Berry v. U.S. Postal Serv.*, No. 22-3577, 2023 WL 3035371, at *3 (6th Cir. Apr. 21, 2023) (citing *White*, 699 F.3d at 875–76).

The same principle would apparently apply even in the context of the "continuous workday" rule. Under that rule, commuting from one worksite to another *after* commencement of the workday is generally compensable under the FLSA. *See* 29 C.F.R. 785.38 ("Where an employee is required to report at a meeting place to receive instructions or to perform other work there, or to pick up and to carry tools, the travel from the designated place to the work place is part of the day's work, and must be counted as hours worked regardless of contract, custom, or practice."); *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 226 (2014) ("[T]he Portal-to-Portal Act[, which amended the FLSA in 1947,] did not alter what is known as the 'continuous workday rule,' under which compensable time comprises 'the period between the commencement and completion on the same workday of an employee's principal activity or activities . . . [,] whether or not the employee engages in work throughout all of that period." (quoting 12 Fed. Reg. 7658 (1947))). Thus, if a BFC technician participates in a mandatory telephone conference that is part of his "principal activities," then his commute after that meeting would apparently be compensable time, as part of the employee's "continuous workday." *Accord Franklin v. Kellogg Co.*, 619 F.3d 604, 618 (6th Cir. 2010) ("[D]uring a continuous workday, any [otherwise non-compensable travel] time that occurs after the beginning of the employee's first principal activity and before the end of the employee's last principal activity is . . . covered by the FLSA" (quoting *IBP, Inc. v. Alvarez*, 546 U.S. 21, 29 (2005)). If, however, the commute time is only sometimes compensable under the continuous workday rule (due to the variable timing of the morning meeting and the end-of-the-

day commute), then the technician would have an obligation to notify BFC that he is entitled to an exception to the automatic deduction policy.

In this case, while it is undisputed that BFC applies an automatic deduction of .5 hours per shift for technicians' commute time, it is also undisputed that, per written policy, employees are to notify it if their commute time is less than .5 hours on a given day. In addition, BFC's policy is that "huddles" are compensable time, and employees are to record all of their time on a phone app—including all commute time—and to record on the app the particular activity in which they are engaged, whether commute time, time spent at the morning huddle, time spent communicating with customers, and time spent working on job sites. (Ashwood Decl. ¶ 23; Babcock Decl. ¶ 9.) Geeo does not state whether he ever notified BFC that the automatic time deduction as applied to him should be adjusted on his records (either because his morning commute was fully compensable or because his evening commute was less than 30 minutes).

Moreover, even if the court accepts as true that Geeo, Brooks, and perhaps other BFC technicians *always* either attended morning huddles before commuting to their first job site or attended the huddles during their commute,[3] such that all or part of their morning commute time would be compensable work time under the FLSA, neither Geeo nor Brooks addresses the question of their commute home. If their commute home at the end of the day was always more than 30 minutes long, then BFC's commute deduction never violated the FLSA as to them, regardless of whether their morning commutes constituted compensable time. Their failure to allege any facts relating to their commute home coupled with BFC's testimony that its study of commute times revealed that its technicians' average daily commute is 45 minutes each way strongly suggests that

---

[3] They do not state that they were unable to denote huddle time during the commute as fully compensable time.

they never suffered an FLSA violation. Further, even if their commute home was occasionally less than 30 minutes, the commute deduction would not violate the FLSA's overtime pay provision *unless* they worked more than 40 compensable hours during that particular pay period *and* BFC failed to make adjustments to their time records when requested to do so.

By way of example, assume that, on a particular day, Geeo performed his uncompensated brief vehicle inspection, then activated his timekeeping app, after which he participated in a 20-minute huddle, then got in a company vehicle and drove 40 minutes to his first job site, worked all day, and then drove 40 minutes to get home. The entirety of his workday, including the morning huddle and morning and evening commutes are entered into the app as work time. The 30-minute commute deduction in that case would not violate the FLSA, even if Geeo worked overtime that week.

Alternatively, assume the same facts except that the commute home that day only took 20 minutes. On that day, the 30 minute commute deduction would result in 10 minutes of time that should have been compensated. Geeo does not state that he ever notified BFC that his commute deduction should be adjusted. Again, the Sixth Circuit has held that, "[w]hen the employee fails to follow reasonable time reporting procedures she prevents the employer from knowing its obligation to compensate the employee and thwarts the employer's ability to comply with the FLSA." *White*, 699 F.3d at 876 (6th Cir. 2012). Thus, if Geeo did not notify BFC, then he would likely be unable to show an FLSA violation. If he did notify BFC and it failed to adjust his time, that failure would give rise to a violation of the FLSA's overtime pay provision only if Geeo's total compensable time for the week added up to more than 40 hours.

Likewise, if Geeo's morning commute on a particular day was only fifteen minutes long and his evening commute was likewise fifteen minutes long, but he either spent the entirety of the

morning commute participating in the fully compensable morning huddle or participated in the huddle before driving, he would again have had a clear obligation to notify BFC that his non-compensable commute time for that day was only 15 minutes, since the telephone call during the morning commute would have made the entirety of it "work" time (and he presumably would have entered it as such on the timekeeping app). Neither the SAC nor Geeo's Declarations address this scenario or suggest that BFC would *not* have made an adjustment in such a case if he had asked for one. Moreover, again, even if BFC incorrectly made a 30-minute commute deduction for that day, it would only violate the FLSA if Geeo worked more than 40 hours that week, such that he should have received pay at the time-and-a-half rate for that uncompensated 15 minutes.

Finally, assume another technician who only participates in three huddles per week. Two of those huddles take place after the technician has already reached his first job site. Although his commutes home those days take only 20 minutes, his total commute time each day is more than 30 minutes, and the continuous workday rule does not apply. On the one day he participates in a huddle before beginning the commute to his first job site, the continuous workday rule applies, but his commute home is longer than 30 minutes. Regardless of whether he works overtime that week, no FLSA violation has occurred.

These scenarios effectively establish BFC's primary points. First, given BFC's undisputed evidence as to its timekeeping practices, Geeo's failure to address his end-of-the-day commute or to allege that his commute home ever took less than 30 minutes means that his SAC, Declarations, and other evidence, considered collectively, fail to conclusively establish that the 30-minute commute deduction *ever* resulted in a deduction of otherwise compensable time, for purposes of his FLSA claim. This is so even if the court accepts as true the plaintiff's allegations that his morning commute was *always* fully compensable under the continuous workday rule, because it

always took place after he had already performed compensable work (by participating in the morning huddle) or while he performed other compensable work (participating in the huddle or making work-related telephone calls during the commute).

Second, even if the court makes some enormous inferential leaps to assume that *Geeo* can establish an FLSA violation—*i.e.*, that he worked more than 40 hours during one or more workweeks, had short commutes home, and notified BFC that his time should be adjusted, but BFC failed or refused to make the adjustment—the evidence now before the court in no way establishes a strong likelihood of the existence of similarly situated others who suffered an FLSA violation. The plaintiff's two Declarations, referring vaguely to conversations with others and their disgruntlement with the commute-time deduction does not establish that other individuals actually suffered FLSA violations. Instead, it establishes, at most, that other employees wished that their entire commute were compensated, regardless of what federal law actually requires. And BFC's uncontradicted Declarations establish wide variations in terms of the timing, duration, and frequency of the morning "huddle." As a result, even if BFC hypothetically failed to fully compensate some employees for all overtime worked, the plaintiff has not shown a strong likelihood that those other employees are similarly situated to him. *Clark*, 68 F.4th at 1011,

To be clear, the court is not making a determination based on the evidence now in the record that Geeo's individual FLSA claims will necessarily fail as a matter of law. The defendant has not moved for summary judgment, and discovery has not been completed. However, the plaintiff agreed to the filing of his Motion for Notice before any effective discovery could take place (*see* Doc. No. 57) and expressly states in support of that motion that he can satisfy his burden of showing a "'strong likelihood' that similarly situated employees exist without the need for discovery" (Doc. No. 61, at 7). He nonetheless had the ability to respond to the defendant's

Declarations with others of his own. He did not do so, and he has not presented any evidence that conflicts with or contradicts the Declarations filed by BFC. Contrary to the plaintiff's assertions, BFC's evidence does not remotely show that its company-wide polices resulted in unpaid overtime hours. At most, it gives rise to the *possibility* of FLSA violations if many, many preconditions were met. This remote possibility does not meet *Clark*'s strong likelihood standard, which requires the plaintiff to establish something more than a mere disputed question of fact as to the existence of similarly situated employees who have suffered a common FLSA violation.

The plaintiff, in short, has not shown that he and BFC's other technicians suffered from a "a single, FLSA-violating policy" or that their "claims [are] unified by common theories of [BFC's] statutory violations, even if the proofs of these theories are inevitably individualized and distinct." *Monroe v. FTS USA, LLC*, 860 F.3d 389, 398 (6th Cir. 2017) (quoting *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 584-85 (6th Cir. 2009); *see also Pierce v. Wyndham Vacation Resorts, Inc.*, 922 F.3d 741, 745 (6th Cir. 2019). Nor has he shown the existence of a *de facto* policy of circumventing the FLSA. *Fenley v. Wood Group Mustang, Inc.*, 325 F.R.D. 232, 242 (S.D. Ohio 2018). Consequently, he has not established that "collective litigation would yield 'efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity.'" *Clark*, 68 F.4th at 1012 (quoting *Hoffman-LaRoche Inc. v. Sperling*, 493 U.S. 165 (1989)).

One additional note: the fact that only two putative opt-ins (aside from the named plaintiff) have filed Notices of Consent to Join and that Geeo has presented only his and one other Declaration in support of his Motion for Notice does little to substantiate his claim that there are other employees waiting in the wings who desire to join in this collective action. In the Eleventh Circuit, at least, before facilitating notice, a "district court should satisfy itself that there are other

employees . . . who desire to 'opt-in' and who are 'similarly situated' with respect to their job requirements and with regard to their pay provisions." *Morgan v. Fam. Dollar Stores, Inc.*, 551 F.3d 1233, 1259 (11th Cir. 2008) (quoting *Dybach v. Fla. Dep't of Corrs.*, 942 F.2d 1562, 1567 (11th Cir. 1991)). The plaintiff in this case purportedly has personal knowledge of other technicians who "worked overtime hours without receiving all of their overtime compensation because [of] BFC's commute deduction," but he does not identify them. (Geeo Decl. ¶ 19.) He has "spoken to other current or former BFC technicians on this issue," and "[s]ome of the people" he has talked to "have chosen to come forward and join this lawsuit" (*id.*), but he does not purport to know of any other similarly situated employees who actually desire to "opt in" to this case. Brooks purports to be "confident" that others would join this lawsuit "if it becomes a class action" (Brooks Decl. ¶ 17), but this unsubstantiated subjective belief does not actually establish the existence of any other employees who believe they are entitled to overtime pay and desire to join this lawsuit. While not dispositive on its own, this factor certainly contributes to the court's conclusion that the plaintiff has failed to establish that there are similarly situated employees who have suffered an FLSA violation and would join this lawsuit if given notice of it.

## IV.    CONCLUSION

For the reasons set forth herein, the court will deny the Motion for Notice (Doc. No. 60) and deny as moot the Motion to Toll Statute of Limitations for future opt-in plaintiffs (Doc. No. 26). An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge